EASTERN DISTRICT OF LA.

2015 NOV 19 P 2: 57

WILLIAM ... BLEVINS
CLERK



## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

### SUPERSEDING INDICTMENT FOR INVOLUNTARY MANSLAUGHTER, VIOLATIONS OF THE OUTER CONTINENTAL SHELF LANDS ACT AND CLEAN WATER ACT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | CRIMINAL NO. 15-197 |
| v. | * | SECTION: "H" |
| DON MOSS | * | VIOLATIONS: 43 U.S.C. § 1350(c)(1) |
| CURTIS DANTIN | | 18 U.S.C. § 1112 |
| GRAND ISLE SHIPYARDS, INC. | * | 33 U.S.C. § 1321(b)(3) |
| BLACK ELK ENERGY OFFSHORE | | 33 U.S.C. § 1319(c)(1)(A) |
| OPERATIONS, LLC | * | |
| WOOD GROUP PSN, INC. | | |
| CHRISTOPHER SRUBAR | * | |

\*       \*       \*

The Grand Jury charges that:

### COUNT 1—INVOLUNTARY MANSLAUGHTER

#### A. AT ALL TIMES MATERIAL HEREIN

1.      Beginning at a time unknown, but no later than on or about July 1, 2010, and continuing until on or about October 13, 2013, **BLACK ELK ENERGY OFFSHORE OPERATIONS, LLC ("BEE")**, a privately-held limited liability company with headquarters in Houston, Texas, owned and operated an oil production facility erected on a federal mineral lease, OCS-00367, in the Gulf of Mexico approximately eight (8) nautical miles from the shoreline of the state of Louisiana at an area designated as West Delta 32 in the territorial jurisdiction of the

Fee_____
Process_____
Dktd_____
CtRmDep_____
Doc. No._____

Eastern District of Louisiana.

2.     **BEE**'s production facility at West Delta 32 consisted of three bridged platforms, "A," "D," and "E." **BEE** contracted with **WOOD GROUP PSN, INC. ("WOOD GROUP")**, a Scottish corporation with a registered office in the United Kingdom, and a primary United States office in Houston, Texas, for individuals to man and conduct operations at the West Delta 32 facility. The crew for West Delta 32 consisted of a Lead operator, also known as a Person-In-Charge ("PIC"), an "A" operator, a "B" operator, a "C" operator, and a Roustabout. **WOOD GROUP** does not operate or lease its own production facilities, it provides manpower to other offshore oil companies.

3.     A PIC is responsible for the oversight and safety of the production facility. Starting on or about November 8, 2012, the PIC for the facility at West Delta 32 was defendant, **CHRISTOPHER SRUBAR ("SRUBAR")**.

4.     Beginning at a time unknown, but no later than on or about September 1, 2012, oil production at West Delta 32 was shut-in, meaning wells associated with **BEE**'s West Delta 32 facility were not flowing, due to damage in pipelines that transported **BEE**'s oil.

5.     Following the shut-in, **BEE** undertook a number of construction projects on the platforms of the West Delta 32 facility and beginning on or about November 3, 2012, **BEE** initiated construction projects that included replacing the floatcell, also known as the WEMCO, replacing valves on the manifold of the production header, and installing a divert valve on the Lease Automatic Custody Transfer (LACT) unit and tying it into the sump line piping.

6.     The LACT system was the last point in the production process prior to the oil leaving West Delta 32 and entering the sales transmission pipeline. The LACT system consisted of two pumps that took suction from one of two 400 barrel Dry Oil Tanks on "E" platform. The

pumps discharged through the basic sediment and water ("BS&W") meters and then through the oil pipeline pumps to the sales pipeline. **BEE** planned to have the system modified to include a divert valve. The divert valve would redirect flow to the Wet Oil Tank when the BS&W monitor indicated unacceptable contaminants in the crude oil, keeping it out of the pipeline for sale until it was processed to an acceptable quality.

7.      In October 2012, **BEE** contracted with an engineering firm to design plans for the floatcell replacement. **BEE** hired defendant, **DON MOSS ("MOSS")**, to be physically present at the West Delta 32 facility to inspect and coordinate the construction project and manage the financial expenditures.

8.      The construction was to be physically completed by crews from defendant, **GRAND ISLE SHIPYARDS, INC. ("GIS")**, a company located at 18838 HWY 3235 Galliano, Louisiana.  Beginning at a time unknown, but prior to November 3, 2012, **BEE** contracted with **GIS** for a multiple-man construction crew. The construction crews were supervised and managed by defendant, **CURTIS DANTIN ("DANTIN")**, a construction superintendent employed by **GIS**. The construction workers on West Delta 32 consisted of **GIS** employees and employees from a third-party subcontractor. The sub-contracted employees were from the Philippines. **WOOD GROUP**'s operators supported the construction efforts to include crane operations and issuing necessary permits.

9.      Beginning on or about November 3, 2012, **MOSS** arrived on the West Delta 32 facility. On or about November 6, 2012, **DANTIN** and **GIS** construction workers arrived on the facility. Every person that went onboard the facility at West Delta 32 was required to complete an orientation form. The orientation form included a provision that stated that each morning at 6 a.m., the PIC was to conduct a safety meeting and that attendance was mandatory.

10.     All the construction projects on West Delta 32 required hot work, meaning welding, grinding, and/or any other activity that may produce a spark. Hot work on an oil production facility is a hazardous activity which is capable of causing injury or death if done without due care and adherence to safety procedures and regulations.

11.     Pursuant to Title 43, United States Code, Section 1348(b)(2), as the leaseholder and designated operator of federal mineral lease OCS-00367, BEE was required to maintain all operations in the lease, including WD-32, in compliance with regulations intended to protect persons, property, and the environment on the Outer Continental Shelf.  Title 30, Code of Federal Regulations, Section 250.113 imposed requirements that **BEE** and others had to follow when welding in an area outside of a designated safe work area, which is an area on the platform that has previously been identified as a safe area for hot work in a welding plan.

12.     As defined in Title 30, Code of Federal Regulations, Section 250.105, "You" means a lessee, the owner or holder of operating rights, a designated operator or agent of the lessee(s), a pipeline right-of-way holder, or a State lessee granted a right-of-use and easement. Here, "You" included **BEE** as the lessee and owner or holder of operating rights, and **WOOD GROUP** and **GIS** and their employees and agents, as a designated operator or agent of **BEE**.

13.     The person(s) performing the activity to which the requirements of Title 30, Code of Federal Regulations, Section 250.113 applied, including **WOOD GROUP** and **GIS** and their employees and agents, were jointly and severally responsible with **BEE** for complying with the regulation.  30 C.F.R. § 250.146(c).

14.     According to Title 30, Code of Federal Regulations, Section 250.113(a), before "You" weld, you must move any equipment containing hydrocarbons or other flammable substances at least 35 feet horizontally from the welding area. You must move similar equipment

on lower decks at least 35 feet from the point of impact where slag, sparks, or other burning materials could fall. If moving this equipment is impractical, you must protect that equipment with flame-proofed covers, shield it with metal or fire-resistant guards or curtains, or render the flammable substances inert.

15.     According to Title 30, Code of Federal Regulations, Section 250.113 (c)(1)(i), before welding outside of a designated safe work area begins, "You" may not begin welding until the welding supervisor or PIC advises in writing that it is safe to weld. The written permission is commonly referred to as a "hot work permit."

16.     Title 30, Code of Federal Regulations, Section 250.113(c)(1)(ii), before welding outside of a designated safe work area begins, "You" and the PIC must inspect the work area and areas below it for potential fire and explosion hazards.

17.     According to Title 30, Code of Federal Regulations, Section 250.113(c)(2), during welding, the PIC must designate one or more persons as a fire watch. The fire watch must:

(i) have no other duties while actual welding is in progress;

(ii) have usable firefighting equipment;

(iii) remain on duty for 30 minutes after welding activities end; and

(iv) maintain continuous surveillance with a portable gas detector during the welding and burning operation if welding occurs in an area not equipped with a gas detector.

18.     According to Title 30, Code of Federal Regulations, Section 250.113(c)(3), "You" may not weld piping, containers, tanks, or other vessels that have contained a flammable substance unless you have rendered the contents inert and the PIC has determined it is safe to weld.

19.     **BEE**, **WOOD GROUP**, and **GIS** had written policies for hot work that tracked the language in the regulations for welding and burning, including a requirement for written permission for hot work, inspection requirements, firewatch designations, and ensuring that piping that had contained hydrocarbons be rendered inert before welding.

20.     **SRUBAR** issued hot work permits for the construction work on WD-32 for November 8 and 9, 2012.  Starting on or about November 10, 2012, **SRUBAR** stopped issuing hot work permits and stopped conducting all-hands safety meetings.  **SRUBAR** delegated the hot work permitting to the **WOOD GROUP** "C" operator, a member of the production crew who had only 7 months of experience offshore and had never issued a hot work permit previously. Upon instruction by **SRUBAR**, the "C" operator created each hot work permit by copying the one **SRUBAR** did on November 9, 2012.  **SRUBAR** did not conduct a pre-work inspection with the construction crew every day that hot work was performed, nor did he designate a firewatch for the hot work areas.  The "C" operator did not perform a pre-work inspection with the **GIS** crew before providing each new hot work permit.  **SRUBAR**, told the "C" operator that, if needed, **DANTIN** would designate a firewatch.

21.     On or about November 11, 2012, **MOSS** discovered that piping for the LACT upgrade was missing.  When **DANTIN, MOSS,** and **SRUBAR** were unable to locate the missing piping, in order to save time, a **BEE** manager decided to have all the piping re-built. The construction crews were required to do field welds on the platform in order to connect the divert valve to the sump line piping.  **MOSS, SRUBAR,** and **DANTIN** knew that the LACT upgrade would take place before the construction crew left the platform on or about November 16, 2012. **MOSS** and **DANTIN** knew that the welding of the sump line piping would be required to complete the LACT unit upgrade.

22.    After leading a 6:00 a.m. safety meeting with the **GIS** workers on November 16, 2012, **DANTIN** instructed some of the Filipino construction workers to begin the welding of the sump line piping for the LACT unit upgrade, while others finished projects on the cellar deck and at the floatcell.

23.    **MOSS, DANTIN**, and **SRUBAR** did not communicate with one another about the hot work that was to be done on the sump line piping that day. No one from **BEE, WOOD GROUP**, or **GIS** conducted a joint pre-work inspection of the LACT area or sump line piping prior to the issuance of a hot work permit. The "C" operator copied the previous day's hot work permit which did not mention the LACT area or sump line piping. There was no gas detector reading taken of the LACT area or sump line piping prior to the issuance of the hot work permit. No firewatch was designated as required by law.

24.    **DANTIN** was watching as the workers made cuts to the sump line piping leading to the Wet Oil Tank. The Wet Oil Tank was approximately 20 feet from the welding area on the sump line piping.  The Wet Oil Tank could not be physically moved 35 feet from the welding area and the hydrocarbons in the Wet Oil Tank had not been rendered inert prior to the workers beginning the project.  The sump line piping which previously contained hydrocarbons had not been rendered inert.  After the cuts to the sump line piping were made, liquid spilled from the piping.  **DANTIN** and the workers decided that the liquid was water. **DANTIN** did not ask **SRUBAR** or **MOSS** whether the piping had been rendered inert or determine whether the liquid coming from the piping posed a threat.  **DANTIN** left the area and returned to the office located on another platform within the West Delta 32 facility.

25.    Following the cuts to the sump line piping, the construction workers commenced grinding on the piping. At approximately 9:00 a.m. on November 16, 2012, the construction

7

workers attempted to tack weld on the cut piping with an arc welder. At that time, hydrocarbon vapors that had escaped from the Wet Oil Tank were ignited. The ignition caused an explosion setting off a series of additional explosions in the three oil tanks on the platform. One of the Dry Oil Tanks and the Wet Oil Tank were blown into the Gulf of Mexico. The other dry oil tank was blown off its base and destroyed the platform crane. Oil was spilled into the Gulf of Mexico causing a sheen on the water. Oil rained down to the lower deck of the platform where workers below the LACT unit had been performing other construction activity. As a result of the explosions, Avelino Tajonera, Elroy Corporal, and Jerome Malagapo died. Other workers were burned and injured.

26.     Prior to the explosion on November 16, 2012, **SRUBAR**:

   a.     failed to do a pre-work inspection with the construction workers of the area where they would be performing hot work prior to allowing a hot work permit to be issued,

   b.     authorized the "C" operator, to whom he delegated the issuance of hot work permits, to issue a hot work permit without doing a pre-work inspection,

   c.     instructed the "C" operator to copy the hot work permit from the previous day for the construction crew to use on November 16, 2012, without requiring the "C" operator to go through the steps required by the law and **BEE** and **WOOD GROUP** policies for the issuance of the permit,

   d.     failed to verify or have the "C" operator verify with **MOSS** or **DANTIN** where the construction crew would be performing hot work prior to issuing the hot work permits,

   e.     failed to create or have the "C" operator create multiple hot work permits for the locations of hot work on the platform so that a firewatch for each location could maintain a record of gas detector readings,

   f.     failed to take or require the "C" operator to take a gas detector reading for hydrocarbon vapors in the area where the construction crew would be performing hot work prior to the issuance of a hot work permit,

   g.     failed to designate or require the "C" operator to designate a fire

watch who would have fire-fighting equipment and maintain gas detection in the area where the construction crew would be performing hot work,

h.      failed to conduct a morning safety meeting with all personnel on board,

i.      failed to attend the construction crew morning safety meeting and Job Safety Analysis meeting,

j.      failed to conduct a walk-through of any areas of the platform to determine if the areas were safe for hot work.

27.   Prior to the explosion on November 16, 2012, **DANTIN** and members of the construction crew:

a.      failed to tell **SRUBAR** or any **WOOD GROUP** operator that hot work would be performed on the sump line piping on November 16, 2012,

b.      failed to ensure that the construction crew safety meeting, Job Safety Analysis meeting, and Job Safety Analysis worksheet specifically stated that the crews were performing sump line hot work and LACT divert valve installation,

c.      performed hot work without **SRUBAR** or any **WOOD GROUP** operator conducting a pre-work inspection of the area where the construction crew would be performing hot work,

d.      failed to get a hot work permit before performing hot work on the sump line piping,

e.      failed to ensure that the contents of the sump line piping which had contained hydrocarbons and was connected to the Wet Oil Tank had been made inert and the piping was safe to weld before performing hot work,

f.      conducted hot work without a firewatch equipped with the necessary fire prevention equipment including a functioning gas detector,

g.      failed to block the piping from the Wet Oil Tank before welding the sump line piping,

h.      failed to tell **SRUBAR** or **MOSS** that liquid spilled from the cut made in the sump line piping before commencing with hot work,

i.      failed to exercise stop work authority when liquid spilled from the sump line piping, and

j.      failed to continuously monitor the hot work at the sump line piping with a gas detector.

28.     Prior to the explosion on November 16, 2012, **MOSS**:

    a.      failed to tell **SRUBAR** that hot work would be performed on the sump line piping on November 16, 2012,

    b.      failed to coordinate the hot work for the sump line piping,

    c.      failed to read the construction crew's Job Safety Analysis prior to the crews beginning work, and

    d.      failed to inform the construction crew at their morning safety meeting and Job Safety Analysis meeting that the sump line piping had not been rendered safe for hot work.

29.     At all times herein, **GIS** acted through its agents and employees, including **DANTIN** and the construction crew, whom acted within the scope of their agency and employment for the benefit, at least in part, of **GIS**. **WOOD GROUP** acted through its agents and employees, including **SRUBAR** and the "C" operator, whom acted within the scope of their agency and employment for the benefit, at least in part, of **WOOD GROUP**. **BEE** acted through its agents and employees, including **SRUBAR**, the "C" operator, **WOOD GROUP**, **DANTIN**, the construction crew, **GIS**, and **MOSS,** whom acted within the scope of their agency and employment for the benefit, at least in part, of **BEE**.

30.     As a result of the explosion, expenses were incurred by **BEE** and others for accident investigation, repairs, clean up, and search and rescue, which constitute a loss pursuant to the Alternative Fines Act, 18 U.S.C. § 3571. The total expenditures were $9,707,749.00 USD.

31.     The "special maritime and territorial jurisdiction" of the United States is defined in Title 18, United States Code, Sections 7 as:

    (1) The high seas, any other waters within the admiralty and maritime jurisdiction of the United States and out of the jurisdiction of any particular State, …

(2)   Any place outside the jurisdiction of any nation with respect to an offense by or against a national of the United States.

## B.   THE OFFENSE CONDUCT—INVOLUNTARY MANSLAUGHTER

On or about November 16, 2012, within the special maritime and territorial jurisdiction of the United States, on an oil production facility known as West Delta 32, erected on a federal mineral lease in an area in the Gulf of Mexico in the territorial jurisdiction of the Eastern District of Louisiana, **BEE** and **GIS** did cause the death of Jerome Malagapo in the commission in an unlawful manner, and without due caution and circumspection, of a lawful act which might produce death, to wit: supervising and conducting hot work on an oil production facility, in violation of Title 18, United States Code, Section 1112.

## Count 2—INVOLUNTARY MANSLAUGHTER

A.      The allegations contained in Paragraphs 1-31 of Count 1 of this Superseding Indictment, as set forth above, are realleged and incorporated by reference as though set forth in their entirety herein.

B.      On or about November 16, 2012, within the special maritime and territorial jurisdiction of the United States, on an oil production facility known as West Delta 32, erected on a federal mineral lease in an area in the Gulf of Mexico in the territorial jurisdiction of the Eastern District of Louisiana, **BEE** and **GIS** did cause the death of Avelino Tajonera in the commission in an unlawful manner, and without due caution and circumspection, of a lawful act which might produce death, to wit: supervising and conducting hot work on an oil production facility, in violation of Title 18, United States Code, Section 1112.

## Count 3—INVOLUNTARY MANSLAUGHTER

A.       The allegations contained in Paragraphs 1-31 of Count 1 of this Superseding Indictment, as set forth above, are realleged and incorporated by reference as though set forth in their entirety herein.

B.       On or about November 16, 2012, within the special maritime and territorial jurisdiction of the United States, on an oil production facility known as West Delta 32, erected on a federal mineral lease in an area in the Gulf of Mexico in the territorial jurisdiction of the Eastern District of Louisiana, **BEE** and **GIS** did cause the death of Elroy Corporal in the commission in an unlawful manner, and without due caution and circumspection, of a lawful act which might produce death, to wit: supervising and conducting hot work on an oil production facility, in violation of Title 18, United States Code, Section 1112.

## Count 4—FAILURE TO CONDUCT A PRE-WORK INSPECTION

A.       The allegations contained in Paragraphs 1-31 of Count 1 of this Superseding Indictment, as set forth above, are re-alleged and incorporated by reference as though set forth in their entirety herein.

B.       On or about November 11, 2012, **WOOD GROUP, CHRISTOPHER SRUBAR, BEE, CURTIS DANTIN,** and **GIS,** in connection with activities under the Outer Continental Shelf Lands Act and affecting natural resources belonging to, appertaining to, and under the exclusive management authority of the United States, on an oil production facility known as West Delta 32, erected on a federal mineral lease in an area in the Gulf of Mexico in the territorial jurisdiction of the Eastern District of Louisiana, did knowingly and willfully fail to conduct a pre-work inspection of the welding areas and the areas below the welding areas prior to welding beginning, in violation of Title 30, Code of Federal Regulations, Section

12

250.113(c)(1)(ii) and  250.146(c), and all in violation of Title 43, United States Code, Section 1350(c)(1).

## Count 5—FAILURE TO CONDUCT A PRE-WORK INSPECTION

A.     The allegations contained in Paragraphs 1-31 of Count 1 of this Superseding Indictment, as set forth above, are re-alleged and incorporated by reference as though set forth in their entirety herein.

B.     On or about November 12, 2012, **WOOD GROUP, CHRISTOPHER SRUBAR, BEE, CURTIS DANTIN,** and **GIS,** in connection with activities under the Outer Continental Shelf Lands Act and affecting natural resources belonging to, appertaining to, and under the exclusive management authority of the United States, on an oil production facility known as West Delta 32, erected on a federal mineral lease in an area in the Gulf of Mexico in the territorial jurisdiction of the Eastern District of Louisiana, did knowingly and willfully fail to conduct a pre-work inspection of the welding areas and the areas below the welding areas prior to welding beginning, in violation of Title 30, Code of Federal Regulations, Section 250.113(c)(1)(ii) and  250.146(c), and all in violation of Title 43, United States Code, Section 1350(c)(1).

## Count 6—FAILURE TO CONDUCT A PRE-WORK INSPECTION

A.     The allegations contained in Paragraphs 1-31 of Count 1 of this Superseding Indictment, as set forth above, are re-alleged and incorporated by reference as though set forth in their entirety herein.

B.     On or about November 13, 2012, **WOOD GROUP, CHRISTOPHER SRUBAR, BEE, CURTIS DANTIN,** and **GIS,** in connection with activities under the Outer Continental Shelf Lands Act and affecting natural resources belonging to, appertaining to, and

13

under the exclusive management authority of the United States, on an oil production facility known as West Delta 32, erected on a federal mineral lease in an area in the Gulf of Mexico in the territorial jurisdiction of the Eastern District of Louisiana, did knowingly and willfully fail to conduct a pre-work inspection of the welding areas and the areas below the welding areas prior to welding beginning, in violation of Title 30, Code of Federal Regulations, Section 250.113(c)(1)(ii) and 250.146(c), and all in violation of Title 43, United States Code, Section 1350(c)(1).

## Count 7—FAILURE TO CONDUCT A PRE-WORK INSPECTION

A.      The allegations contained in Paragraphs 1-31 of Count 1 of this Superseding Indictment, as set forth above, are re-alleged and incorporated by reference as though set forth in their entirety herein.

B.      On or about November 14, 2012, **WOOD GROUP, CHRISTOPHER SRUBAR, BEE, CURTIS DANTIN,** and **GIS,** in connection with activities under the Outer Continental Shelf Lands Act and affecting natural resources belonging to, appertaining to, and under the exclusive management authority of the United States, on an oil production facility known as West Delta 32, erected on a federal mineral lease in an area in the Gulf of Mexico in the territorial jurisdiction of the Eastern District of Louisiana, did knowingly and willfully fail to conduct a pre-work inspection of the welding areas and the areas below the welding areas prior to welding beginning, in violation of Title 30, Code of Federal Regulations, Section 250.113(c)(1)(ii) and 250.146(c), and all in violation of Title 43, United States Code, Section 1350(c)(1).

14

## Count 8—FAILURE TO CONDUCT A PRE-WORK INSPECTION

A.      The allegations contained in Paragraphs 1-31 of Count 1 of this Superseding Indictment, as set forth above, are re-alleged and incorporated by reference as though set forth in their entirety herein.

B.      On or about November 15, 2012, **WOOD GROUP, CHRISTOPHER SRUBAR, BEE, CURTIS DANTIN,** and **GIS,** in connection with activities under the Outer Continental Shelf Lands Act and affecting natural resources belonging to, appertaining to, and under the exclusive management authority of the United States, on an oil production facility known as West Delta 32, erected on a federal mineral lease in an area in the Gulf of Mexico in the territorial jurisdiction of the Eastern District of Louisiana, did knowingly and willfully fail to conduct a pre-work inspection of the welding areas and the areas below the welding areas prior to welding beginning, in violation of Title 30, Code of Federal Regulations, Section 250.113(c)(1)(ii) and 250.146(c), and all in violation of Title 43, United States Code, Section 1350(c)(1).

## Count 9—FAILURE TO CONDUCT A PRE-WORK INSPECTION

A.      The allegations contained in Paragraph 1-31 of Count 1 of this Superseding Indictment, as set forth above, are re-alleged and incorporated by reference as though set forth in their entirety herein.

B.      On or about November 16, 2012, **WOOD GROUP, CHRISTOPHER SRUBAR, DON MOSS, BEE, CURTIS DANTIN,** and **GIS,** in connection with activities under the Outer Continental Shelf Lands Act and affecting natural resources belonging to, appertaining to, and under the exclusive management authority of the United States, on an oil production facility known as West Delta 32, erected on a federal mineral lease in an area in the

Gulf of Mexico in the territorial jurisdiction of the Eastern District of Louisiana, did knowingly and willfully fail to conduct a pre-work inspection of the welding areas and the areas below the welding areas prior to welding beginning, in violation of Title 30, Code of Federal Regulations, Section 250.113(c)(1)(ii) and 250.146(c), and all in violation of Title 43, United States Code, Section 1350(c)(1).

### Count 10— FAILURE TO MAKE PIPING SAFE

A.      The allegations contained in Paragraphs 1-31 of Count 1 of this Superseding Indictment, as set forth above, are re-alleged and incorporated by reference as though set forth in their entirety herein.

B.      On or about November 16, 2012, **DON MOSS, BEE, CURTIS DANTIN** and **GIS** in connection with activities under the Outer Continental Shelf Lands Act and affecting natural resources belonging to, appertaining to, and under the exclusive management authority of the United States, on an oil production facility known as West Delta 32, erected on a federal mineral lease in an area in the Gulf of Mexico in the territorial jurisdiction of the Eastern District of Louisiana, did knowingly and willfully fail to ensure that the sump line piping and the contents of the oil tanks that contained hydrocarbons were rendered inert and were determined by the PIC to be safe to weld before hot work commenced in violation of Title 30, Code of Federal Regulation, Section 250.113(c)(3) and 250.146(c), all in violation of Title 43, United States Code, Section 1350(c)(1).

## Count 11—FAILURE TO OBTAIN WRITTEN AUTHORIZATION

A.      The allegations contained in Paragraphs 1-31 of Count 1 of this Superseding Indictment, as set forth above, are re-alleged and incorporated by reference as though set forth in their entirety herein.

B.      On or about November 16, 2012, **DON MOSS, BEE, CURTIS DANTIN** and **GIS** in connection with activities under the Outer Continental Shelf Lands Act and affecting natural resources belonging to, appertaining to, and under the exclusive management authority of the United States, on an oil production facility known as West Delta 32, erected on a federal mineral lease in an area in the Gulf of Mexico in the territorial jurisdiction of the Eastern District of Louisiana, did knowingly and willfully fail to get written authorization from the PIC to perform hot work on the sump line piping prior to commencing with the work in violation of Title 30, Code of Federal Regulation, Section 250.113(c)(1)(i) and 250.146(c), all in violation of Title 43, United States Code, Section 1350(c)(1).

## Count 12—CLEAN WATER ACT

A.      The allegations contained in Paragraphs 1-31 of Count 1 of this Superseding Indictment, as set forth above, are realleged and incorporated by reference as though set forth in their entirety herein.

B.      On or about November 16, 2012, in waters of the United States in connection with activities under the Outer Continental Lands Act and affecting natural resources belonging to, appertaining to, and under the exclusive management authority of the United States within the 200 mile exclusive economic zone from the coast of Louisiana all in the Eastern District of Louisiana, the defendants, **WOOD GROUP, CHRISTOPHER SRUBAR, DON MOSS, BEE, CURTIS DANTIN,** and **GIS,** did negligently discharge and cause to be negligently discharged a

17

harmful quantity of oil into the Gulf of Mexico from a production facility known as West Delta

32, when oil entered the Gulf of Mexico after an explosion on the platform causing a sheen on

the water, all in violation of Title 33, United States Code, Sections 1319(c)(1)(A) and

1321(b)(3).

A TRUE BILL:

KENNETH ALLEN POLITE, JR.
UNITED STATES ATTORNEY

EMILY K. GREENFIELD
Assistant United States Attorney
La. Bar Roll No. 28587

JOHN C. CRUDEN
ASSISTANT ATTORNEY GENERAL
ENVIRONMENT AND NATURAL
RESOURCES DIVISION

KENNETH E. NELSON
Senior Trial Attorney

New Orleans, Louisiana
November 19, 2015

FORM OBD-34

*No. 15-197 "H"*

## UNITED STATES DISTRICT COURT

Eastern _____ *District of* _____ Louisiana

_____ Criminal _____ *Division*

### THE UNITED STATES OF AMERICA

vs.

**DON MOSS**
**CURTIS DANTIN**
**GRAND ISLE SHIPYARDS, INC.**
**BLACK ELK ENERGY OFFSHORE**
**OPERATIONS, LLC**
**WOOD GROUP PSN, INC.**
**CHRISTOPHER SRUBAR**

## SUPERSEDING INDICTMENT

INDICTMENT FOR INVOLUNTARY
MANSLAUGHTER, VIOLATIONS OF THE
OUTER CONTINENTAL SHELF LANDS
ACT AND CLEAN WATER ACT

**VIOLATIONS:** 43 U.S.C. § 1350(c)(1)
18 U.S.C. § 1112
33 U.S.C. § 1321(b)(3)
33 U.S.C. § 1319(c)(1)(A)

_Filed in open court this_

_____ *day, of*

_____ *A.D.* 2015.

_____
_Clerk_

Bail, $ _____

**EMILY K. GREENFIELD**
Assistant United States Attorney